Irving Elevator v. Heser, parties ready to proceed? Counsel? May it please the Court, I repeat, the Circuit Court misapplies the law in three ways when it dismissed Irvington's claims for fraud and negligent misrepresentation. The Circuit Court erred because it failed to recognize that Irvington pleaded some of the Heser's misstatements were statements of past or existing fact, and standing alone, these statements should have been enough to support a fraud claim. The Circuit Court erred when it failed to recognize that Irvington pleaded the Heser's forward-looking statements were a scheme to defraud, and therefore, those forward-looking statements were actionable as fraud. And finally, the Circuit Court erred when it dismissed Irvington's negligent misrepresentation claim on the basis of the economic loss doctrine because Irvington pleaded an exception to that rule when it pleaded that the Heser's were in the business of providing information to Irvington so that Irvington could, in effect, create crop insurance for the Heser's. There is over 100 years of reported cases in this state that hold the type of bait-and-switch tactics that Irvington pleaded the Heser's used to deceive him at the very least opens the courtroom doors to Irvington and allows him to plead his case for fraud, for negligent misrepresentation. The Circuit Court's ruling, if allowed to stand, will shut out of court the plaintiff who is deceived into taking some action to its detriment and can't otherwise shoehorn the defendant's deception into a breach of contract claim. That is not the law of the state of Illinois, and the Circuit Court's opinion cannot stand. Well, I mean, counts 1 and 2 are still pending, and those are breach of contract actions, right? Yes, Your Honor. So your client's not shut out of court. They still have the breach of contract claim. Judge Stewart, they are shut out of a cause of action that they've properly pled, and there's elements of a fraud claim, as I'm sure this Court is aware, that cannot be collected in a contract claim, such as punitive damages. Which, of course, is why you're bringing the fraud claim. But when you say they're shut out of court, they're not totally shut out of court. They still have their breach of contract claim. That is correct. Okay. There is one item that the parties to this appeal agree on this afternoon, and that is when this Court picks up Irvington's complaint, second-minute complaint, to analyze it, it must accept as true all of the facts pleading in that complaint, and it must construe all reasonable inferences from those facts in Irvington's favor. To be clear, this is not a case about whether Irvington's allegations are believable, or if they're even true. You're not alleging fraud in the inducement, are you? We're alleging common law fraud, Your Honor. Fraud in the inducement of the contract? We're alleging that Irvington was induced fraudulently to enter the contract, but I believe fraud in the inducement would be more properly pled than that as an affirmative defense to the existence of the contract. We are alleging that the Hessers, in the common law sense of the word, defrauded Irvington. They were farmers. Yes, Your Honor. Presumably they had enough wherewithal to provide the amount of grain contracted. Yes. Why would this not be a business decision as opposed to fraud? It's not a business decision, Your Honor, because there was a bait-and-switch that Irvington pleaded. Some of the contracts were complied with, though, right? No. None of them were? Not a single one, Your Honor. I thought some of the grain was delivered. On the last day of the delivery period, after counsel... When the price went down, the grain was provided, was it not? That is not the case, Your Honor. I cannot agree with that assertion. Well, I mean, the facts are the facts. You know more about it than I do. We don't have the record yet, but none of the contracts were complied with. No, Your Honor. None of the contracts were complied with. The grain was delivered to Irvington in harsh settlement of the claims of the parties, but none of the contracts were complied with because the defendants never called Irvington to set the basis price to establish the contracts as cash contracts. And Irvington pleaded that the defendants did not, when they delivered the grain, accept any of the terms of the contracts under which they had delivered. They wanted a better price, a higher price, a dollar or a bushel higher. So, Your Honor, for that reason, I can't agree that the Hessers did deliver. It's my understanding that the Hessers, they set up a contract a year ahead and then they paid on that one and delivered so that this next was a plan of attack or whatever to not pay, not present the grain. Judge Welch, what we pleaded was that two years in advance, the Hessers gave their scheme a trial. Right, that's what I mean. And what they did was they set up grain contracts to be delivered a number of months in advance. They didn't sign those contracts and they waited to see which way the price of the grain went. When the price of the grain that they had contracted dropped, they didn't deliver the grain. Instead, they called Irvington and they said, will you honor those contracts and instead of allowing us to deliver the grain, we make a profit on it anyway because the market price has fallen below our contract price. Why don't you just cash us out? And to that, Irvington replied, well, we'd be in the same position either way, so we'll cash you out. So in the trial run of the scheme, Your Honor, there was no delivery of the grain. I thought there were certain contracts that were signed and as to those signed contracts, they did deliver the grain. Your Honor, there were certain contracts that were signed. We've pledged that one of the defendants, Andy Hessler, signed these without the knowledge of the others. And the others didn't know these were signed until counsel provided the Hesslers with copies of these contracts and they said, oh no, some of them are signed. Maybe we should deliver some grain. Although they delivered grain, they did not deliver. Irvington did not plead they delivered pursuant to the terms of the contracts that were signed because they refused to accept that price. They dumped off the grain, demanded a higher price than the price in the contract, and in fact subsequently sued Irvington, tried to maintain a separate lawsuit in this case for what they deemed to be Irvington's breach of contract. But the issue, again, for this court today is whether within the four corners of the complaint, Irvington has pleaded a valid claim for fraud and the facts fit fraud. The first reason is that the Hesslers made statements, Irvington pleaded the Hesslers made statements that passed their existing fact in paragraphs 200 and 201 of the complaint there before you. Irvington pleaded that on two different occasions the Hesslers represented to Irvington, once over the phone and once in an in-person meeting, that those black signature lines in the contract, they're not there because they're not intending to deliver. Prices don't shift their way. They're there because of an oversight. Irvington pleaded that that statement was false. They knew it was false at the time. They made it Irvington relied on that statement and spent money to maintain the futures hedge for the Hesslers and therefore suffered damage. Irvington also pleaded that the Hesslers made another misstatement of present or past fact when the Hesslers failed to object to dozens of confirmation statements that Irvington hand-delivered to the Hesslers. Under the Uniform Commercial Code, the Hesslers had a duty to object if these confirmation statements were incorrect. In fact, in time after time, when those confirmation statements were placed in defendant's mailbox, they failed to object. This was tantamount to an acknowledgment of a past act, the Hesslers' entry into a definite grain deal. The second reason why Irvington has pleaded the proper case of fraud is because with respect to the Hesslers' promises of future performance, their repeated promises of we will deliver, we will deliver pursuant to the contracts, with respect to those promises, Irvington pleaded that they were part of a scheme to defraud. And a scheme to defraud in a case law is a difficult animal to nail down. But I think that the case of Vance v. Pearson or the case of Vance Pearson v. Alexander summarizes it best in the pronouncement, the scheme to defraud must be showed by something other than the broken promise itself. That begs the question, what is something other than the broken promise itself? In Vance Pearson, two Supreme Court cases, and a host of others, there's something else that made those forward-looking statements actionable as fraud was deception. It was bait and switch. The bait and switch in Vance Pearson occurred when the defendant, to get the plaintiff's down payment in business, promised that plaintiff, hey, I can build your truck scales in 45 days. The plaintiff relied on that statement to its detriment, paid $8,000 down to the defendant, but all along the switch was that the defendant intended to abide by an entirely different deal. He knew he couldn't finish the grain scales in 45 days. He knew he couldn't finish the grain scales in 90 days, but he got plaintiff's business and he got plaintiff's money. The court in Vance Pearson found that to be actionable as a scheme to defraud. The defendants could have complied with the contract. You're not alleging that they were not farmers. You're not alleging that they did not have the capabilities of getting X number of bushels of grain, are you? We have made no such allegation, Your Honor. So they could have complied, you think? What we have pled is that they never intended to comply with the contracts that they entered into. The contracts that they entered into, it was an unambiguous promise. We will deliver, no matter what, a definite amount of bushels of a definite type of grain at a definite date. Why couldn't you look at it like, well, they then determined that it was financially not to their benefit and they made a business decision to breach the contract. In other words, why isn't this just an efficient breach? No. Why wouldn't it be a business decision? They said, well, we'll make more money by breaching the contract. We'll pay the damages. Under the precedent in Illinois, it shouldn't be construed as a business decision because we've pled that they had the fraudulent intent before they ever entered into these contracts with us. And if, in fact, it was a business decision, then that's... Well, I can see if they weren't farmers, then that would be pretty evident that they had no intention nor capabilities of providing the grain if they were somebody other than a farmer. But is there anything to indicate that they could not have complied with it? That it would have been impossible for them to deliver the grain? No. We have not pled anything in this complaint about what their capacity was to grow or deliver the subject grain. But what we have pled, Your Honor, similar to the facts in Vance Pearson's Bull v. Dubish decided by this circuit, HBI Healthcare, Steinberg, two Supreme Court cases, was that defendants dangled a promise in front of Irvington in order to induce Irvington to take an action to its detriment. They dangled that unambiguous promise, we will deliver in front of Irvington, so that Irvington would construct a hedge against falling prices. Because of their past dealings with Irvington, they knew that Irvington himself futures on the sea bottom to protect them from falling prices. Again, explain why the Mormon doctrine is not applicable here. The Mormon doctrine is not applicable to a fraud case by the holding of the Supreme Court in that case. The court held, this court has held that economic loss is recoverable where one intentionally makes false representations and one who is in the business of supplying information for the guidance of others in their business transactions makes negligence representations. And again, I guess the problem I have is what information are you talking about? I know you briefly mentioned it at the beginning. Could you go over that again? Why the economic loss? No, right. What information they were in the business of providing. Sure. With respect to the negligence claim, it's important to understand how a hedge-to-arrive grain contract works as Irvington has it pleaded. There's two stages. In the first stage, all that is happening between the farmer and the elevator is that the elevator is providing crop insurance to the farmer for some future delivery. In the first stage of a hedge-to-arrive grain transaction, the farmer tells the elevator, we've pledged, what type of grain is going to be delivered on what date and in what quantity. The elevator then goes out and sells the futures contract in the Chicago Board of Trade that exactly matches the terms provided to it by the farmer. Except for the price. Except for the price. And the price is close. It's a difference of basis that's determined on the day of delivery. The point is when a hedge-to-arrive contract is first made, the farmer couldn't, if he wanted to, deliver grain. All that exists at that point is the futures hedge that the elevator has taken out, pursuant to the grain code, for the benefit of the farmer. So the farmer is protected from downward-falling prices. And it's that first part of the transaction where the hessers were information providers. Irvington literally could not have called up the Chicago Board of Trade, called its broker, and said, we need to sell futures for this particular type of grain and this particular quantity to expire on this date. They couldn't have given any of that information to their broker had it not been supplied by the hessers first.  without the hessers' unambiguous promise to deliver grain pursuant to those terms. But the end product of that first transaction was not tangible. It was crop insurance. It was only after the hessers, at some later point in time, and these were contracts for delivery, some of them were two years or more in the future, and it was only at some distant point in time, after the hessers picked up the phone and called Irvington and said, today we want to lock in the basis. The basis is the number, it's the difference between the futures price and the local grain price. And that amount typically is deducted from the futures price by the elevator. And then, and only then, at that point, far down the road is the contract become a cash contract. Once it's a cash contract, it can be delivered upon. Then the essence of the transaction is grain. With the first part of the transaction, no grain can be delivered. Only information is exchanged, and it's for the purpose of providing crop insurance to benefit the producer. And that's not a tangible product, and that is why it's taken out of the economic law study. The facts that Irvington has pleaded fit the problem. The hessers' forward-looking statements were part of a scheme to defraud Irvington. The hessers' statements of present or existing fact are enough by themselves to support the cause of action for fraud. It's not contested today that Irvington has failed to meet the specificity of the case. I think that's evident in the Second Amendment complaint. The facts also fit negligent misrepresentation. For those reasons, we respectfully request that this Court overrule the Circuit Court and allow Irvington to proceed with its theories of fraud and negligent misrepresentation. Thank you. May it please the Court. My name is Chris Petrie, and I represent the defendants in counterclaimants Robert Hesser, Robert Hesser, Jr., and Andy Hesser, who are three farmers who reside in rural Illinois. The first issue on appeal today is did the trial court properly dismiss the plaintiff's fraudulent misrepresentation claim? And I submit to you that it did for several reasons. This was strictly a 2-615 motion, is that right? Yes, the allegations of the complaint were insufficient. And the first reason, which is the most direct reason, it's the simplest reason, and it's the ground upon which the trial court held, is this. The complaint alleges a fraud based on a promise of future action, the delivery of wheat in the future at a certain price. The case law is clear that because a promise of future action is not a statement of past or existing fact, in order for the promise of future performance to be held, a fraudulent misrepresentation, it has to be made as part of a scheme with no intention to perform at the time the promise is made. That's what Donnelly says, that's what Steinberg says, that's what HPI says. No intention to perform or without intention to perform. By the allegations of this complaint itself, it cannot be said that these defendants had no intention to perform at the time they made their promise to deliver wheat. And the reason for this is because by the allegations of the complaint itself, the defendants orally agreed to deliver grain in the future at a certain price, knowing that if the market went up, they would not deliver. But if the market went down, they would deliver. And in response to your question about examples in the complaint of the farmers performing, there are examples. They did perform on written contracts. And even on unwritten contracts at paragraphs 180 and 181 of the complaint, the record page 142 and 143, the plaintiffs allege on an unwritten contract when the market went down, we tendered performance. We said we're ready to perform. We'd rather just have the cash now. And they agreed. So it is clear that there was at least some intention to perform at the time the promise was made. And the intention to breach, as the trial court stated, did not arise until on or after the delivery date. And this makes this case fundamentally different from any case the plaintiff cites, the HPI, Gold, all of those cases. If this court were to hold in the plaintiff's favor on this point, it would be creating new law. It would be saying even when the plaintiff has some intention to perform, when he promises a future action, he can still be held liable for fraud. And that is going to open up the floodgates for fraud cases, for fraud claims, which are really breach of contract claims in grand transactions and otherwise. As you pointed out, Your Honor, this is just an example of efficient breach. Everybody, when they enter contracts, has reservations. They understand there are circumstances that will make them perform or not perform. If a defendant has some intention to perform, he cannot be held liable for fraud. And even the Vance case, the Vance case that counsel talked about as one of their leading cases, what does the court say? It said it has to find that at the time of the promise, the defendant knew that it would not perform. That cannot be said by the allegations of this complaint. So that is the first reason it was proper to dismiss the fraudulent misrepresentation claim. The second reason is because it is the second element of this test. The plaintiffs failed to properly plead a scheme, and they did this for two reasons. They failed to plead a benefit that we induce a benefit to us by making these promises of future action, and they only alleged repeated assurances of performance. If you look at the cases that the plaintiff cites, they're far different than this case. In Steinberg, the defendant received a $15 application fee for each of his false promises. In HPI, the defendant received two years' worth of medical supplies. In Gold, the defendant received the plaintiff's employment. The plaintiff actually quit his job and came to work for the defendant. If you go back and look at the seminal cases in this area, like Willis-Viatkins and Rota, they say the false promise of future conduct is the scheme used to accomplish the fraud and cheat another of his property. We did not cheat them of property. We did not cheat them of cash. We cheated them of nothing. They allege that the benefit we receive is what they call costless downside price protection. But if you look at the complaint, the costless downside price protection is manifested by them placing a hedge. If you look at the complaint at paragraphs 28 and 31, you will see that they allege that they placed that hedge for their own benefit. It is to lock in a profit for Irvington. It is to minimize Irvington's price risk. They only get that profit, though, if your clients perform and deliver the grain. That is correct. But when they say they bought insurance for us, they bought insurance for them. Well, your client, though, has the knowledge of knowing that they've got their grain sold at a certain price and they have a contract to sell it to the grain elevator for that. So that does provide them with some protection, doesn't it? That's why you do it. That's why you enter into a futures contract. But the benefit that they receive by placing this second contract is a benefit to them. I agree that by entering the contract at a fixed price in the future, we are getting a benefit. But in terms of what they're claiming is the benefit to us, this costless downside price protection, I believe that the complaint shows, and I think that the industry shows, that that is really insurance for them. You're not required to do this, are you? Vis-a-vis your contract with the Hester's, you were required to go out there and sell futures, were you? No. No, it's the elevator that sells the futures, the hedge. We're not obligated. We can enter hedge-to-arrive contracts. We can enter conventional forward delivery contracts. There's a few different kinds of contracts that we can enter. But undoubtedly, the re-contracting with the Chicago Board of Trade is something that the elevator does, and I believe it is to their benefit, not ours. Okay, just to make sure. They allege that their hedge was to your benefit. That's the distinction you're making. The contract you entered to them was to your benefit. Correct. Their hedge was not. Correct. That is correct. All right. I would also point out that if you look at the allegations of scheme in this case compared to the other cases that the plaintiff cites, that this case is far different. In the HPI case, there were 11 different actions of scheme that were plagued,  describing sources of funding to pay back the debt when the sources of funding were fictitious. If you look at the Steinberg case, it involves five straight years of a printed brochure going out with a misrepresentation on it, a false promise of future conduct. It involves five years of accruing application fees and pledge money that was not supposed to come in if it had been evaluated according to the promise in the brochure. All this complaint really alleges is that we orally agreed to deliver grain, and then someone came and knocked on our door and said, are you going to perform, and we said yes. Again, if this is a scheme, then we're opening up the door on a lot of breach of contract cases to be fraud cases. There's a third reason that the dismissal of the fraud case was correct, and that's because there's no justifiable reliance. The plaintiff has to show that it had a right to rely on the representations. The elevator is a merchant. It is deemed to know the UCC, and it in fact knows the UCC, as it pleaded three times to ask my clients to sign the contracts. The UCC has a statute of frauds in it. It's an Illinois statute, and it says in order for contracts of this magnitude, over $500, to be enforced, they have to be in writing and signed by the party to be charged. Oral promises are not good enough. They knew that, and they relied on our oral promises anyway. That is not justifiable reliance by a merchant. And I would point you to a couple of cases in this area. I will tell you that they are not right on point, but their teaching is very similar to the argument that I'm making. And that is the Stickoff case. That says for both parties, or commercial parties, they're presumed to know the law, and reliance on a representation of law that is incorrect is unreasonable. Similarly, this merchant, this elevator, is presumed to know that oral promises for goods over $500 are not enforceable, and therefore relying on oral promises was unreasonable as a matter of law. I should also point to the Tarapelli case. This is a case between commercial parties where the plaintiff relied on an oral representation when there was an integration clause in the contract. The court said, no, you can't do that. That's unreasonable reliance as a matter of law. Well, what is the UCC's statute of frauds? It's basically a general integration clause. It says for certain kinds of promises, they have to be in writing, and you can't rely on them unless they're in writing. So under the teaching of those cases, the reliance was unreasonable as a matter of law. Because there is such a large loophole in their scheme theory, the plaintiffs for the first time in this case, in this appeal, for the first time, are making a new argument. They're saying that the complaint also contained a misstatement of past or existing fact, independent from the scheme. Before I reach the merits of that, I will point out this argument has been waived. In fact, if you go and look at the second amended complaint, it consistently refers to a scheme. Its titling refers to the formation of the scheme, giving the scheme a trial run, effectuating the scheme. In their response to our motion to dismiss, they didn't make one argument. They didn't say one word about a misrepresentation of a past or existing fact. And at a motion to dismiss hearing, when they were asked, point blank, why should the fraud case go forward, they said, because we fled the elements that are necessary to fit into the fraudulent scheme exception. This is waiver. They don't really dispute that this was not raised at the trial court level. What they say is that because this is a de novo standard review, that there can be no waiver. And they first asserted this in the reply brief. So this is my first chance to respond to it here. I would point the court to the Baldivinos case, 394-ILL-ATP-3D, page 14, and the Cambridge case, 378-ILL-3D-437. Those are both cases holding a waiver in the context of a de novo standard review, and one of them is on a motion to dismiss. They also say that because it's mentioned in the complaint, because the alleged statement of fact is mentioned in the complaint, it's not waived. But that's not correct either, because waiver isn't about what you put in the complaint. Waiver is about the arguments you make to the trial court. This court is supposed to have the benefit of a fully briefed trial record on that, and the trial court's reasoning on that point. Of course, it does not, because it was not raised by the plaintiff below. Even if it was not waived, the statement is still not actionable. First of all, as I previously explained, it's still oral representations, basically, regarding the delivery of grain. And their reliance on oral representations, when they're a merchant and they know the statute of frauds in the UCC, is unreasonable reliance as a matter of law. And then also, the statement is, allegedly, that we said we didn't sign the contract as a matter of oversight. That statement is not material, was not relied upon, and was not made to induce action by the allegations of the complaint. If you look at the cases that they cite for saying that this is a statement of existing fact, an actual statement of existing fact, the Bates and the Sommer case, they're readily distinguishable. They involve statements about the legal content of documents and statements made to induce people to enter these contracts. This statement wasn't a statement about the legal content of the document. In addition, it was made post-transaction. The oral agreement had already occurred. The hedges had already been placed. So there could be no reliance or an intent to induce action. Finally, even if you were to accept the idea to get past all of these points and say that it is actionable, by their own admission, the damages would have to be limited to maintaining the hedge, not the cost of placing the hedge, not the price difference in the grant. There's a fifth point on fraud, and that is they allege fraud by silence, although they didn't mention it much in this oral argument. The fraud by silence fails for two reasons. One is my clients had no duty to speak. They cite a couple of old cases in one 2004 case for the general proposition that when there's compelling circumstances, someone would have a duty to speak. But I submit to you that those cases are outliers, and they're old. Again, this is my first chance to respond to this because this argument was made in a reply brief. I would direct the court to the Connick case, 174 ILL 2D, page 482, and the DeLuna case, 223 ILL 2D, page 49. Those cases are Supreme Court cases right on point. And they say in order to have a duty to speak or a duty to disclose, you have to be in a fiduciary confidential relationship or a relationship where the defendant has the trust of the plaintiff or is superior to the plaintiff. And in fact, the Connick case dismisses a complaint between a buyer and a seller on a fraudulent concealment theory because the plaintiff had not alleged that kind of relationship. That kind of relationship is not alleged here, nor could it be, since these are two merchants acting under the UCC with adverse interests. In addition, even if there was a duty to speak, it would still be a duty to speak regarding action in the future. And so for all the reasons that I stated earlier about why a promise of future action is not actionable in this case, it would apply as well to this. That sums up the points on the fraudulent misrepresentation. As for the negligent misrepresentation, that's the second issue on appeal. And I submit to you that the trial court properly dismissed the negligent misrepresentation claim under the Mormon doctrine and its progeny. Mormon says that purely economic loss is not recoverable under a theory of negligent misrepresentation. Mormon also says that there's an exception when the party charged with the misrepresentation is in the business of supplying information for the guidance of others in their business transactions. The defendants are not in the business – and by the plaintiffs, you can see that they're only asserting purely economic loss. The defendants are not in the business of supplying information. They're in the business of supplying rent, and that's what the complaint alleges. Now, I'll grant you that the plaintiff has made an argument about how he supplied information, such as price points and things like that. But the Lincoln Park case, the Hartman case, the Fireman's Fund case, all of these cases say that when the contemplated result of the transaction is the creation and delivery of a tangible thing, information that is supplied is incidental thereto and does not fulfill the Mormon doctrine. And so under a straightforward application of those cases, the Mormon doctrine, the Mormon exception, would not be satisfied here. And if you compare those cases to this case, there was a lot more information provided in those cases. Some of them involved the architect on buildings providing plans, but the court saying, well, even though he provided the plans, at the end of the day, there was this tangible building, and that defeats the Mormon doctrine. Also, another example is a water supply system that was designed by an engineer. Again, the plaintiff wants to say, well, the engineer submitted all these plans and information to us, and it was wrong. It was negligently misrepresented to us. The court says, now the water system is the tangible product. Similarly here, grain was the tangible result at the end of the transaction. And so the negligent misrepresentation claim was properly dismissed under a straightforward application of those cases. They do cite one case called the Illinois Bell case in their presentation on the negligent misrepresentation claim. Illinois Bell is of no help to them. In Illinois Bell, there was a utility provider who was the defendant, and there was a specific statute on point. And that statute allows someone to make an information request to the utility. The utility then had a statutory duty to respond with information. The court said, because in this limited transaction, the utility is solely an information provider under the statute, solely an information provider, then the Mormon exception was fulfilled. Well, in this case, we were not solely an information provider. The contemplated result of the transaction was grain, nor was there a specific statute allowing for an information request. And so for these reasons, it was proper for the trial court to dismiss the negligent misrepresentation case as well. I wanted to reserve, or not reserve, I've done with my prepared comments. If you have any questions, I would be happy to answer them. Counsel, since you did cite some cases on oral argument here, if you'd want this court to take notice of them, you need to file a motion or leave to file additional authority, if you would. I will reserve. Okay. And then you can put those cases in there, if you claimed it. If these are in response to opposing counsel's reply. Okay. Thank you. Thank you, Your Honor. Counsel, rebuttal, please. Your Honor, the Hesters have contended that Irvington didn't plead a scheme to defraud because they had some intent of performing, for example, prices went down, and they said, well, then we perform. And the cases say, no intent of performing, well, we've got a will, so therefore, no fraud. The way that this court should look is that the Hesters made one very specific promise to Irvington with respect to these contracts, and that is, we will deliver no matter what. And that was not the deal they intended to abide by. They did not intend to deliver no matter what. They intended to have Irvington pay money to purchase crop insurance for them, and then they waited. The inducement is the exact same as the inducement that existed in HBI. The Hesters cite HBI health care, a Supreme Court case, and say there were dozens of examples of fraud in that case, as if the quantity of fraud somehow morphs it into an actionable scheme. Well, Irvington has pleaded that it delivered dozens of confirmation statements, that the Hesters made dozens of misrepresentations of their future intent, and that the Hesters made at least several misrepresentations of past or present. So if it's a question of quantity, it's not. But if it is, we've pledged. The Hesters argue that there's a requirement in the law that Irvington has to plead a benefit to the Hesters. No, Irvington has to plead detriment to itself to establish a scheme to defraud. But if there is a requirement that says we have to plead that the Hesters have to plead a benefit to the Hesters, and the Hesters receive the benefit, well, then we've pledged. And if this Court follows the standard of review, it should accept that, because we've pledged, Justice Stewart, as you noticed, we've pledged that the Hesters did receive something of value. Otherwise, why would they do it? The value that they received, the benefit that they received, was that two years in advance of that growing season, no matter what the weather, no matter what the condition of the markets, no matter what the Chinese were doing with their grain, the Hesters were sure about a floor price that they were going to get for their grain. And that is as tangible a benefit as can be. So if it's required that Irvington plead it, Irvington has pledged. Justice Spomer, you noted that the Hesters didn't have to sell futures. You ask counsel, who did sell the futures? And Irvington sold the futures, but that raises an important point. Irvington pleaded in its Second Amendment complaint that the Hesters knew they could have gone out and opened up an account with a futures broker, like F.C. Stone, and they could have hedged their own grain. Irvington pled that would have cost the Hesters money. Those monies that Irvington advanced to start the hedge, the monthly compound interest that Irvington paid over the two years while the hedge was up and running, the Hesters would have had to pay that if they would have insured their own crops. But they didn't. They schemed to defraud to get Irvington to insure those crops. To the extent that the Hesters have argued, Irvington did not plead justifiable reliance on the Hesters' statement that it was just a mere oversight, why the contracts didn't remain unsigned. I point you to paragraph 211 of the complaint, where we stated that we relied on their statement about mere oversight. With respect to negligent misrepresentation, Illinois Bell is on point. Illinois Bell certainly was not in the business of providing information to contractors. It doesn't matter that the Hesters are farmers, not typically in the business of providing information. Illinois Bell says, look at the transaction. Look at the transaction at issue. And here we have a two-part transaction. The first part of that transaction is wholly and solely dependent on the Hesters providing accurate information to Irvington so that it could sell futures appropriately. And they failed to. The facts satisfy fraud. The facts satisfy negligent misrepresentation. Thank you. Thank you, gentlemen, for your arguments today and your briefs. Thank you, Mayor and Vice Mayor.